**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

AMY BURKHART-DEAL, individually
and on behalf of all others similarly
situated,

        Plaintiffs,

        v.

CITIFINANCIAL, INC.; and DOES 1
through 10, inclusive,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

**ELECTRONICALLY FILED**

**Civ. A. No. 07-01747**

**Judge Donetta W. Ambrose**

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S ADDENDUM TO HER MOTION TO COMPEL
IN SUPPORT OF ADOPTION OF PLAINTIFF'S SEARCH PLAN**

## I.    INTRODUCTION

Apparently dissatisfied with the documents previously produced by Defendant

CitiFinancial, Inc. ("CitiFinancial" or "Defendant") because they do not support her collective

action claims, Plaintiff Amy Burkhart-Deal ("Plaintiff") now seeks to force CitiFinancial to

undertake time-consuming and costly new searches for documents in her Addendum to

Plaintiff's Motion to Compel in Support of Adoption of Plaintiff's Search Plan ("Addendum").

Plaintiff's proposed "Search Plan" that she urges this Court to adopt requests that CitiFinancial

search any form of data, including inaccessible data, for over 1,300 different custodians over a

four year period for any possible complaint relating to compensation or failure to pay overtime

using a list of over 100 different search phrases. Plaintiff's Search Plan demands that all sources

be searched regardless of cost, burden or likelihood of finding relevant documents and that all

documents that contain any of the search phrases be produced without any relevance review.

Plaintiff even seeks to have CitiFinancial redo all the searches of hard copy documents that were

already conducted by over 200 managers and Human Resources ("HR") personnel because the searchers were not provided with a list of over 100 Boolean search phrases that Plaintiff's counsel believes that they should have to look for in each and every document, regardless of whether the document itself has any relevance to any complaint about compensation or failure to pay overtime. CitiFinancial requests that the Court reject Plaintiff's request for a fishing expedition. Plaintiff has not established in her Addendum that the additional searches that she seeks to compel are likely to lead to relevant, admissible evidence, especially when balanced with the extreme burden and expense that would be imposed on CitiFinancial.

As relevant background, this lawsuit did not come about through some employee who felt aggrieved and went to a lawyer. Rather, the lawsuit was the result of a mass mailing solicitation letter with a pre-fabricated class action complaint from class action attorneys. The solicitation letter sought facts and sought a plaintiff. Plaintiff, who was not looking for an attorney to sue CitiFinancial at the time, bit on the solicitation efforts and retained the attorneys who sent the letter, her current counsel. However, she was unable to provide any evidence to support the collective action off-the-clock allegations: she testified in this matter that she was aware of no nationwide policy or practice of failing to pay for overtime worked that would support collective action treatment of this lawsuit. In fact, the only relevant CitiFinancial policy identified in the litigation is the written policy providing that all non-exempt and overtime-eligible employees are compensated for overtime work at one and a half times the regular hourly rate of pay for hours worked beyond 40 in a workweek. Moreover, none of the other evidence produced in discovery, including the documents already produced to Plaintiff in response to her request for complaints about compensation or overtime pay, support the collective action claims in the complaint. Thus, Plaintiff must continue to fish for evidence.

2

Now Plaintiff wants CitiFinancial to cast a second broad net to find complaints about compensation or failure to pay overtime in the ultimately fruitless hope that she can find some evidence to support her collective action. Claiming that the initial search undertaken by CitiFinancial was inadequate, Plaintiff demands that CitiFinancial look for a needle in a haystack. She even desperately resorts to the disingenuous suggestion that CitiFinancial improperly destroyed evidence by decommissioning its old e-mail system when it is undisputed that the system was retired and backup tapes were created long before Plaintiff filed her lawsuit. The costs and burdens of recovery of backup tapes from that system, as well as the extraordinary costs of the complex electronic searches that Plaintiff demands on both the old and the current systems, so far outweigh any possible benefits of the search that Plaintiff's entire Search Plan and Motion to Compel should be denied.

Moreover, Plaintiff's premise that CitiFinancial's initial search for complaints was not adequate is unsupported. CitiFinancial thoroughly searched all complaints received through the Ethics Hotline – which was the original focus of Plaintiff's requests as it is the most likely source of complaints – that involved the branches at issue both through electronic search terms in a database and through manual review of the actual complaints. Moreover, because complaints might have been made through sources other than the hotline, CitiFinancial required over 200 managers and HR professionals to search their own hard copy and electronic files – **including e-mail** – for complaints about compensation or failure to receive overtime pay. CitiFinancial also diligently searched its HR database for responsive documents. As a result of this extensive search, CitiFinancial located and produced documents regarding eight issues about compensation or overtime pay that were raised by employees at any of the 145 branches that were searched (consisting of over 70 pages). However, those documents do not support Plaintiff's allegations.

To the contrary, they reveal that CitiFinancial promptly addressed and corrected each of the few such situations uncovered and that it disciplined the managers at fault.

Plaintiff offers no basis to believe that the additional searches that she now demands, particularly the electronic e-mail searches of CitiFinancial's old and current systems – even if they were to reveal any additional complaints about compensation or failure to pay for overtime – would somehow result in a different set of complaints that, unlike the others, show that CitiFinancial had some nationwide policy of failing to pay for overtime worked. Moreover, the cost of the search all e-mails of employees, managers and HR personnel at the 145 CitiFinancial branches for the needle in the haystack that Plaintiff hopes to find would be extremely costly. For the e-mail archive of the current system, because of the number of users involved, CitiFinancial estimates that there are over 1,000 GB of data (or over 100 million pages) that would have to be loaded into a searchable platform. Based on estimates from three outside vendors, this would cost $700,000 at a minimum and up to almost $1.2 million before the e-mails could be searched and reviewed. The legal review costs for privilege and responsiveness could bring the total to well over two million dollars.

Backup tapes from the old e-mail system covering the period from December 2004 through August 2007 are more problematic. Two outside vendors have estimated the cost to be between $450,000 and $800,000 to get the backup tapes into a readable format similar to those in the current e-mail archive. CitiFinancial would then have to load the data into a search platform, apply the search terms and then load it into a review platform, incurring more of the sort of costs already described with respect to the current e-mail system. Such excessive costs for the fishing expedition requested are not justified in this action.

4

Beyond the e-mail searches demanded by Plaintiff, her Search Plan would require hundreds of managers and HR personnel to spend days or weeks reviewing hard copy documents for the presence of over 100 different words or phrases rather than review them intelligently for context, as has already been done. Thus, because of the extreme undue burden that these requests would place on CitiFinancial, especially compared with the small likelihood of finding relevant documents, CitiFinancial respectfully requests that Plaintiff's demand for a new search be rejected in its entirety. To the extent that any additional search is required, all costs should be shifted to Plaintiff to pay for the extremely costly and unnecessary searches that she seeks.[1]

## II.    BACKGROUND

### A.    Procedural Background And Searches Already Conducted By CitiFinancial

On August 14, 2008, Plaintiff filed a motion to compel regarding her Document Request No. 15, which asked for "All documents concerning any formal or informal complaint received during the Relevant Time Period about your policies or practices regarding compensation for hours worked or any complaint that you failed to pay overtime . . . ." The request sought documents regarding complaints from employees at every single CitiFinancial branch location nationwide. As discussed in CitiFinancial's opposition to Plaintiff's original motion, Plaintiff sought this discovery despite the fact that she testified that she had no basis to believe that anyone had worked off the clock or been improperly compensated other than (allegedly) herself. This Court decided on September 11, 2008 that Plaintiff was not entitled to all complaints about compensation or failure to pay overtime nationwide, but rather, Plaintiff was limited to

---

[1]    As discussed below, to the extent that the Court determines that some additional search of e-mail is warranted despite the low likelihood of uncovering relevant information, CitiFinancial offers an alternative herein that would focus on an electronic search: 1) limited to the current archive e-mail system, 2) limited to a total data size of 20 GB (about two million pages) for such sampling, and 3) limited to a more narrow set of search words and phrases, followed by proper review by Defendant and its counsel for privilege and responsiveness to Plaintiff's discovery request at issue, with the costs to be borne equally by both parties.

complaints at a sample of 7% or 145 branches in five geographic locations, as selected by Plaintiff's counsel.

In order to search any document relating to any employee at those 145 branches, CitiFinancial coordinated a massive search of both electronic and hard copy documents in the locations where such documents would most likely be found, summarized as follows:

- For each of the 145 retail branch locations selected, CitiFinancial's internal legal counsel and an HR Director, Julie Judge (formerly Julie Myzick), instructed all Branch Managers to search for all hard copy and electronic files for compensation-related complaints or complaints regarding failure to pay overtime. (Deposition of Julie Judge, February 17, 2009 ("Judge Dep.") at 32-33, 39, attached to Plaintiff's Addendum (Docket No. 66) as Exhibit C.) CitiFinancial instructed its Branch Managers that the search was for purposes of discovery in a wage and hour class action, and they were to construe the request broadly and to search for all possible forms of complaints, including documents contained in hard copy files maintained in the branches, **e-mail** and any other electronic documents on their hard drives and elsewhere. (Judge Dep. at 34, 38.) Following the search, each Branch Manager was directed to confirm compliance with the instruction via e-mail to Ms. Judge. (Judge Dep. at 40-41.) Each Branch Manager complied with the request, and Branch Managers with potentially responsive documents provided them to Ms. Judge. (Judge Dep. at 41.)

- CitiFinancial also instructed all of its District Managers for the 145 branches, and the upper levels of branch management, including Area Directors and Executive Vice Presidents, to conduct the same searches of their files. (Judge Dep. at 31-32, 74-75.)

- CitiFinancial also instructed all of its HR Directors and all HR Generalists involved with the retail branch network to search files, both hard copy and electronic, for complaints about compensation or failure to pay overtime. (Judge Dep. at 31-32.)[2]

- CitiFinancial searched its database for complaints about compensation or failure to pay overtime that were received through the Citigroup Ethics Hotline. All such complaints received by CitiFinancial since 2004 are included in databases maintained by a Human Resources Specialist, Kit Yong. (Deposition of Kit Yong, February 19, 2009 ("Yong Dep.") at 17-18, attached to Plaintiff's Addendum as Exhibit D.) She searched for responsive complaints by using search terms on her electronic database and by manually reviewing complaints received through the Ethics Hotline. (Yong Dep. at 57-58.)

- CitiFinancial searched electronic and hard copy versions of employee files of terminated employees from the 145 branches, both at the branches, in its HR information system (called PeopleSoft) and in off-site storage. (Judge Dep. at 65-68.)

- CitiFinancial searched for certain payroll codes in PeopleSoft which might be indicative of a special one-time payment of overtime outside of the normal process and which could lead to information about an employee complaining about not receiving proper compensation or overtime pay. (Judge Dep. at 32.)

- CitiFinancial also searched PeopleSoft for all forms signed by employees acknowledging the payment of overtime compensation outside of the normal process which, again, might lead to information about an employee complaining about not receiving proper compensation or overtime pay. (Judge Dep. at 65-68.)

---

[2]     Even HR Generalists who were not assigned to the 145 branch locations at issue were instructed to conduct the search, just in case they had changed assignments. Deposition of Robert Cornish, November 13, 2008 ("Cornish Dep.") at 78-79, a copy of relevant portions of which is attached hereto as Exhibit A.

As a result of Defendant's extensive search, Defendant located and produced approximately 73 pages of documents, including Ethics Hotline complaints and e-mails. These documents revealed only eight situations in which a retail branch employee raised an issue about not receiving compensation or overtime pay. This is a tiny total considering that nearly 1,000 employees worked approximately 3.5 million hours at the branches that were searched.[3] The documents produced also revealed that CitiFinancial promptly addressed and corrected each such situation. The documents demonstrate that employees whom CitiFinancial found were not properly paid initially were provided with proper compensation, and managers who did not follow company policy of paying employees for all hours worked were disciplined and/or terminated. Accordingly, the documents produced already show that CitiFinancial paid for all hours worked as consistent with its policy and that it promptly corrected any situations that came to its attention in which the policy was not followed.

After receiving the responsive documents, Plaintiff's counsel, still having no evidence to support any sort of collective action, attempted to continue their fishing expedition by serving CitiFinancial with a second Rule 30(b)(6) deposition notice covering a list of 26 different electronic and other discovery topics, served approximately one week before the scheduled close of discovery. Following several conferences with this Court, CitiFinancial produced six different witnesses on topics directly related to the document request at issue, who testified to the thorough nature of CitiFinancial's search, as well as the inaccessibility of the legacy e-mail system that was not searched.

---

[3]    The 3.5 million total hour estimate is 7% of the total hours worked by all branch employees potentially included in Plaintiff's collective action, from December 2004 to August 2008 as previously determined by CitiFinancial and provided to Plaintiff during discovery. *See also* Declaration of Robert Cornish, August 25, 2008, ¶ 3, filed at Docket No. 52-5 in this matter.

### B. CitiFinancial's Electronically Stored Information

#### 1. Current E-mail Archive

All e-mails from the current Microsoft Outlook corporate e-mail system are archived. (Deposition of Philip Shen, December 12, 2008 ("Shen Dep.") at 7-9, attached to Plaintiff's Addendum as Exhibit E.) Although the e-mail archive is readable and searchable using basic keywords against limited numbers of custodians (Shen Dep. at 16-17), it cannot handle searches that are run against too large an e-mail data-set in the archive, or that are too complex. (Declaration of William A. Makin, March 27, 2009 ("Makin Decl."), at ¶ 3, attached hereto as Exhibit B.) Because the internal program used to search the e-mail archive only allows linear searches, a search of over 100 terms or phrases could take six months or more to complete. Moreover, only 50 GB of data can be retrieved by the CitiFinancial audit team from the archive each day. (Shen Dep. at 28.) Because the search of the current e-mail system demanded by Plaintiff is too complex in terms of the number of search terms and would require a search of too large a volume of e-mails and attachments, CitiFinancial contacted three external vendors to estimate the cost of loading and searching the e-mails from the archive for the over 1,300 custodians requested by Plaintiff over the entire period at issue. (Makin Decl. at ¶¶ 3-5.) Based on the estimated 1,042.73 GB of e-mail data, the vendors estimated that the cost for a comprehensive search of this data would likely be between $688,409 and $1,194,465. (Makin Decl. at ¶ 8.) When the legal and other costs of reviewing these documents for privilege and relevance is added in, the total cost of the search of the active e-mail archive as proposed in the Search Plan could be between 2.75 million and 4.8 million dollars. (Makin Decl. at ¶ 10.)

#### 2. Legacy E-mail System

In or around August 2007, four months *before* this lawsuit was filed, CitiFinancial disabled its old Windows Exchange 5.5 web-based e-mail system that was serving CitiFinancial

employees. (Deposition of Walter Arnold, December 19, 2008 ("Arnold Dep.") at 15-16, attached to Plaintiff's Addendum as Exhibit B.) CitiFinancial transferred its employees to a more modern e-mail system – Microsoft Outlook, discussed above – that had been serving Citigroup, in order to take advantage of the efficiencies of involved in administering a single e-mail system for family of related corporate entities. The old network used at the branches was slow and laborious. It was only a 56K bandwidth and multiple users at a branch would "clog the system and bring the branch to a halt." (Arnold Dep. at 42-43.) As such, some managers did not use e-mail at all (Judge Dep. at 37), and most branch employees did not. (Arnold Dep. at 17, 42 (stating that the legacy e-mail system was generally only accessible to branch managers and managerial employees, and that branch employees did not use e-mail); Deposition of Amy Burkhart-Deal, June 10, 2008 ("Burkhart-Deal Dep.") at 72, relevant portions of which are attached hereto as Exhibit C (stating that she did not use e-mail at CitiFinancial).)

As part of the transfer of employees to the new e-mail system in and around August 2007, CitiFinancial made a business decision not to keep the servers that supported the old e-mail system active because of the maintenance costs, and therefore these servers were disassembled and/or reused by CitiFinancial. (Arnold Dep. 39, 41.) However, e-mails and attachments from all users of the old e-mail system from approximately September 2007 going back to at least December 27, 2004 (the beginning of the relevant time period for purposes of Plaintiff's discovery requests) have been retained by CitiFinancial. Those e-mails were saved on a daily basis on backup tapes which are now retained in storage. (Arnold Dep. at 19-20.)

In order for the thousands of backup tapes of the old e-mail system to be searched, the backup tapes, which were in raw text format, would have to be reconstructed and converted into a format that is readable and actionable, such as Windows Exchange. (Arnold Dep. at 28.)

Walter Arnold, the Director of Branch Support Services who testified as a Rule 30(b)(6) witness regarding CitiFinancial's old e-mail system, explained that an outside vendor made a proposal shortly after the conversion, regarding the cost and timing of converting the backup tapes into a readable and actionable format. (Arnold Dep. at 29.) Mr. Arnold testified that the vendor estimated the time period to convert the backup tapes would be 12 to 18 months. (Arnold Dep. at 29.) He also testified that the vendor provided a cost estimate for converting the backup tapes into a readable form. Between the fixed rate, the project management costs and the per tape charges, the estimated range by the vendor was approximately $500,000 at the low end and between $700,000 and $1,000,000 at the high end. (Arnold Dep. at 55.) Because the archive tapes were created alphabetically by name, and not by location, tapes relating to individuals at the 145 branches cannot be isolated to sample just those branches. Therefore, the entire e-mail system would have to be recovered consistent with the vendor's estimate. (Arnold Dep. at 55).

In addition, in connection with Plaintiff's Search Plan, CitiFinancial sought an update from the original vendor and asked one other vendor to estimate the current cost of the data conversion of the backup tapes limited to those from December 2004 through August 2007. In response, CitiFinancial received very similar estimates of costs that would range between $450,000 to $800,000. (Declaration of Walter Arnold, March 27, 2009 ("Arnold Decl.") at ¶¶ 9-10, attached hereto as Exhibit D.) These estimates were **only** for the restoration of data on backup tapes into readable format – essentially getting it to the same state as the current e-mail archive data – and do not include the costs of loading the data into a platform that allows complex search terms to be applied or the costs of loading it into a review platform. (Arnold Decl. at ¶ 11). These types of additional costs are discussed in the section on the current e-mail archive, *supra.*

3.    Hotline Databases

CitiFinancial utilizes hotlines on which employees can call, anonymously, if they so choose, to lodge a complaint on any topic, including failure to receive proper compensation or overtime.  Although the hotline is not the exclusive means of complaint for CitiFinancial employees, it is the most logical starting point for any search, and it was the focus of Plaintiff's requests in connection with her original Motion to Compel and deposition testimony sought.  CitiFinancial uses the same hotlines as used by other Citigroup entities.  Citi's Ethics Hotline is answered by a third party vendor.  (Yong Dep. at 12.)  Upon receiving a call, the vendor types the caller's answers to set questions into a form, and the data travels through a secure one-way link and automatically populates certain fields of Citi's Ethics Office's Case Management System ("EOCMS"), which is a secure and password-protected web database maintained by Citi.  The form is also converted to .pdf by the vendor and sent to the Citi Ethics Office via an encrypted e-mail.  The Ethics Office can also received complaints by fax.  (Yong Dep. at 31.)

Upon receipt by the Citi Ethics Office, an employee in that office determines, among other things, whether the complaint received relates to Citi's Consumer business, which includes CitiFinancial, and whether it relates to Human Resources issues (which includes compensation issues).  When a complaint relates to the Consumer business and HR issues, the Ethics Office notifies Kit Yong, HR Specialist, of the matter and provides her with a link to the complaint on EOCMS.  (Yong Dep. at 11-12, 18-19.)  Once she accesses EOCMS and the complaint .pdf, Ms. Yong copies and enters the information both from the complaint and the fields of the EOCMS, verbatim, into a Filemaker Pro database.  (Yong Dep. at 32.)  She then distributes the information about the Hotline complaint to a CitiFinancial HR person for investigation, and copies her supervisor, Cathy Miller, an HR Employee Relations Manager.  (Yong Dep. at 34.)  Once the complaint is investigated, HR is expected to fill out an investigative report which is

sent back to Ms. Yong and Ms. Miller. (Yong Dep. at 38-39.) Ms. Miller creates a summary of the resolution, and Ms. Yong copies that resolution summary into her FileMaker Pro database. (Yong Dep. at 46.)

Ms. Yong thoroughly searched the Filemaker Pro database described above for any complaint about compensation or failure to pay overtime. She searched for complaints at the 145 branch locations and searched every entry or document containing any of the following words: "pay," "compensation," "paid," "over" "time" or "unpaid." (Yong Dep. at 57-58.)[4] All responsive hotline complaints have been produced.

Prior to June 2005, CitiFinancial used an earlier version of the Filemaker Pro database, which held less information. Thus, not everything was copied into this database verbatim, just certain fields, although all the .pdfs of the complaints were still available on the shared protected drive. Ms. Yong also thoroughly searched this prior database by reading every single complaint from the selected states to determine its relevance to Plaintiff's request for complaints about policies or practices regarding compensation for hours worked or failure to pay overtime at the 145 branches selected by Plaintiff, and responsive complaints were produced.

## III. ARGUMENT

"[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *Jones v. Norton*, No. 06-2924, 2007 WL 433474, at \*2 (E.D. Pa. Feb. 8, 2007); *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). As one court explained:

> [E]conomic considerations have to be pertinent if the court is to remain faithful to its responsibility to prevent "undue burden or expense." Fed.R.Civ.P. 26(c). If the likelihood of finding something was the only criterion, there is a risk that

---

[4]      Filemaker Pro treats all searches as if there were wildcards in front and in back of any word entered, so that, for example, "sex" would recover "sexual." (Yong Dep. at 71-72.)

someone will have to spend hundreds of thousands of dollars to produce a single e-mail. That is an awfully expensive needle to justify searching a haystack. It must be recalled that ordering the producing party to restore backup tapes upon a showing of likelihood that they will contain relevant information in every case gives the plaintiff a gigantic club with which to beat his opponent into settlement. No corporate president in her right mind would fail to settle a lawsuit for $100,000 if the restoration of backup tapes would cost $300,000. While that scenario might warm the cockles of certain lawyers' hearts, no one would accuse it of being just.

*McPeek v. Ashcroft*, 202 F.R.D. 31, 34 (D.D.C. 2001).  That hypothetical scenario is the one Plaintiff is attempting to create in this case.

### A.    The Searches Of Electronic Data That Plaintiff Requests Are Unduly Burdensome, Which Renders The Data Inaccessible.

Rule 26(b)(2)(B) specifically states that "[a] party <u>need not</u> provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."  (Emphasis added); *see also* Fed. R. Civ. P. 26(c) (a court may limit discovery in order to "protect a party or person from . . . undue burden or expense").  Once the objecting party demonstrates that the electronically stored information is not reasonably accessible, upon a motion to compel or motion for protective order, Rule 26(b)(2)(C) requires that the court look to see if any one of three factors suggests that there is no good cause to produce the documents at all, or whether the inaccessible information should still be produced in some limited fashion, but with some or all of the costs shifted to the requesting party:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at

stake in the action, and the importance of the discovery in resolving the issues.

Rule 26 (b)(2)(c). Although not incorporated into Rule 26 itself, the 2006 Advisory Notes to the Rule cite seven additional factors in assessing good cause and cost-shifting:

i.     The specificity of the discovery request;

ii.    The quantity of information available from other and more easily accessed sources;

iii.   The failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources;

iv.   The likelihood of finding relevant, responsive information that cannot be obtained form other, more easily accessed source;

v.    predictions as to the importance and usefulness of future information;

vi.   The importance of the issues at stake in the litigation; and

vii.  The parties' resources.

As one court has explained, this Rule:

if it is to be sensible and useful, must be read as a means of avoiding undue burden or cost, rather than simply distributing it. Indeed, Fed. R. Civ. P. 1 provides that the Rules are to be "construed and administered to secure the just, speedy *and inexpensive* termination of every action and proceeding." (Emphasis in original). . . . Again the clear objective is the avoidance of undue costs rather than merely the apportionment of it.

*Cason-Merenda v. Detroit Medical Center*, No. 06-15601, 2008 WL 2714239, at *2-*3 (E.D. Mich. July 7, 2008). Here, the searches Plaintiff requests of both the pre-2007 e-mail legacy system that exists only on backup tapes and the archive of the current e-mail system will be unduly burdensome, and Plaintiff does not have good cause to request all of this data.

      1.     <u>Pre-2007 Legacy System Backup Tapes</u>

Even prior to the 2006 amendment to Rule 26, backup tapes were generally considered unduly burdensome to restore and search and, therefore, inaccessible. *See, e.g., Zubulake v. UBS Warburg, LLC,* 217 F.R.D. 309, 319-20 (S.D.N.Y. 2003). Today, where under Rule 26 the focus of inaccessibility is no longer purely on the format of data but rather on whether the search

15

requested imposes an undue burden on the searching party, backup tapes are still generally deemed inaccessible. For example, one court recently held that backup tapes containing deleted e-mails were inaccessible and that there was not sufficient good cause to permit their search. *Petcou v. C.H. Robinson Worldwide, Inc.*, No. 06-cv-2157, 2008 WL 542684, at *1-*2 (N.D. Ga. Feb. 25, 2008). In *Petcou*, the plaintiff wished to find all e-mails with sexual content, but in order to do so, a third-party vendor would have to look through the e-mail of all defendant's approximately 5,300 employees because the defendant did not have servers dedicated to individual branches. *Id.* at *1. The cost for retrieving about two years' worth of e-mail for one employee was approximately $79,300. *Id.* The court held that this was sufficient to show that the e-mails on the backup tapes were not reasonably accessible due to undue burden and costs. *Id.* Moving on to the good cause issue, the court held that the plaintiffs' discovery requests were extremely broad and would require the search of e-mails of all employees in the Atlanta branches for a six year period and were not particularly probative, so the court denied the request to search the backup tapes for lack of good cause. *Id.* at *2.[5]

The situation is even more unduly expensive here. Just as in *Petcou*, CitiFinancial's backup tapes are not dedicated to individual branches, so to conduct the search requested by Plaintiff, over 2,000 backup tapes containing the raw text e-mails of all employees nationwide would have to be restored. Moreover, the recovery and search of CitiFinancial's pre-2007 legacy e-mail system is even more burdensome than in *Petcou* because it involves legacy data where the system to read the data at issue does not even exist anymore. Two vendors have estimated that it

---

[5]      *See also Langbord v. United States*, No. 06 CV 05315, 2008 WL 4748174, at *3 (E.D. Pa. Oct. 22, 2008) (where requesting party asked the court to compel the production of electronic drafts of the defendant's expert's book, the court held that attempts to locate the drafts would create an undue burden, and that the requesting party had not made a showing of good cause sufficient to overcome this burden).

will cost between $450,000 and $800,000 just to convert the data to a readable format.  (Arnold Decl. at ¶¶ 9-10.)  As has been previously discussed, this is just the very first step in the process, and does not include any of the costs that would be incurred to actually search the data or process it for review.  As such, as was the case in *Petcou*, the data here is clearly inaccessible.

Plaintiff attempts to cloud the undue burden and inaccessible data analysis with inflammatory suggestions that there was some wrongdoing by CitiFinancial in transitioning to a new e-mail system in August 2007, four months before the lawsuit at issue here was filed. Plaintiff's argument, however, is nonsensical and has no support in the case law.  First, the fact that CitiFinancial had received internal complaints about compensation from its hotline as early as 2005 does not mean it should have been on notice of a lawsuit several years later, particularly since the complaints were all addressed and remedied and none resulted in lawsuits.  *See United States v. Kitsap Physicians Service*, 314 F.3d 995, 1001 (9th Cir. 2002) (rejecting plaintiff's argument that defendants were put on notice about potential litigation when they initiated an internal investigation, and noting that the plaintiff argument would create a situation where documents would have to be kept in perpetuity if there was a single suggestion, even refuted upon investigation, that there was any improper conduct); *cf. also Claude P. Bamberger International, Inc. v. Rohm & Haas Co.*, No. 96-1041, 1997 WL 33768546, at *3-*4 (D.N.J. Aug. 12, 1997) (in concluding that defendant had not anticipated litigation for purposes of applying work product doctrine, the court noted that plaintiff's pre-filing correspondence had not threatened litigation, but rather sought a business remedy for perceived business wrongdoing). Plaintiff's contention that CitiFinancial should have anticipated Plaintiff's litigation by August 2007 is even more absurd when one considers her admission at her deposition in this matter that ___**she** did not even consider filing a lawsuit against CitiFinancial until she received an__

*unsolicited advertisement from her current counsel inviting her to become a plaintiff in November 2007.* (Burkhart-Deal Dep. at 234-35, 240.)

Plaintiff also claims that CitiFinancial, Inc. should have been on notice of possible litigation because a lawsuit had been filed against a completely different corporation – CitiGroup Global Markets. The lawsuit cited by Plaintiff involved a completely different type of employee, financial advisors or brokers, and it was a misclassification case, not an "off the clock" case. Nothing about a case alleging that brokers working for a different corporation were misclassified under the FLSA would put CitiFinancial on notice of the current lawsuit. Apart from the ridiculous idea that a lawsuit against a different corporation involving a different class of employees premised on a different legal theory requires that a litigation hold be implemented here, CitiGroup Global Markets did not use the legacy e-mail system in question, as it was dedicated only to CitiFinancial employees.[6] Accordingly, there is no doubt that not only are the pre-2007 branch employee e-mails inaccessible, but the inaccessible nature of the data is a result of a completely appropriate business decision by CitiFinancial.

Moreover, there is no good cause to search this inaccessible legacy data. Under Rule 26(b)(2)(C), good cause is absent if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Here, the pre-August 2007 e-mail system at the branch network was so ineffectual that only one person at a branch could use it at a time, and most branch employees

---

[6] Plaintiff attempts to argue that a lawsuit against Citigroup is the same as a lawsuit against CitiFinancial because Kit Yong, who reviews hotline complaints from multiple different corporate entities, stated at her individual (**not** corporate) deposition that she is employed by Citigroup and Julie Myzick (a former HR employee) did not know how the corporations differed. These two facts do not somehow pierce the corporate veil to make Citigroup and CitiFinancial one and the same corporation.

were not able to access it at all. (*See* Arnold Dep. at 17, 42-43; Burkhart-Deal Dep. at 72 (stating that she did not use e-mail at CitiFinancial).) Some branch managers did not even use it. (Judge Dep. at 37.) As such, the likelihood that pre-August 2007 e-mails exist that would contain information about employee complaints about compensation and failure to pay overtime is extremely small. Moreover, all the branch managers, upper level managers, HR representatives and other searchers were instructed to conduct manual searches of their e-mail. As a result of those searches, CitiFinancial located and produced e-mails relating to complaints about compensation or failure to receive overtime from prior to the conversion. Weighing all of this against the extreme cost and burden of having to recreate the entire pre-2007 e-mail system, it is clear that just as in *Petcou*, Plaintiff has not shown good cause for the search.

Plaintiff argues to the contrary by relying on *Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority*, 242 F.R.D. 139 (D.D.C. 2007), a case in which the defendant did nothing to stop the automatic deletion of e-mails until **two-years after** litigation was filed. This is in no way analogous to changing to a different e-mail system **prior** to litigation. Moreover, contrary to Plaintiff's assertion, the seven factors evaluated by the court in *Disability Rights Council* (which are listed in the Advisory Notes to Rule 26 and at p. 15, *supra*) do not support a showing of good cause to search the backup tapes in this case.

First, as to the specificity of the discovery request, as discussed above, the request potentially covers documents relating to all employees from 145 branches during a period of over four years (numbering close to 1,000 total branch employees), as well as hundreds of managers and HR personnel. Moreover, because of the nature of the alphabetical backup tape archive (rather than by branch), <u>all</u> backup tapes will have to be restored in order to conduct the search Plaintiff has requested, and therefore the discovery requested is not and cannot be specific

19

and narrow. Second, as to the quantity of information available from more easily accessible sources, complaints are most likely to be received through the hotline – which was originally the key focus of Plaintiff's investigation but is only briefly addressed in her Addendum – or through calls to Human Resources or calls or conversations with Branch or District managers. Those sources were already searched and pre-2007 e-mails that were responsive to the discovery request were already produced as part of the manual search of the active e-mail system. Third and fourth, Plaintiff has given no reason to believe that additional relevant information on complaints is likely to exist on the backup tapes, or that CitiFinancial has failed to produce relevant information from other sources. Fifth and sixth, although Plaintiff believes that more information on complaints is critical to her ability to demonstrate a policy or practice to support her collective action allegations, the fact that every complaint discovered thus far was remedied, and the fact that managers involved in those incidents were disciplined as appropriate, suggests that additional searches are equally unlikely to provide Plaintiff with relevant information to establish that CitiFinancial has a nationwide policy or practice of not paying overtime compensation. Seventh, as to the resources of the parties, anyone who pays attention to the news is aware that the financial services industry has been adversely affected by the current world-wide financial crisis. CitiFinancial has little money to waste on spurious and unnecessary discovery fishing expeditions. Thus, because Plaintiff has not shown good cause for searching the pre-2007 inaccessible backup tapes in this case, as in *Petcou*, Plaintiff's request for a search of those backup tapes should be denied in its entirety.

Finally, although Plaintiff has not shown good cause for any production of the backup tapes, these same factors demonstrate that if the Court were to order to tapes to be searched, the costs should be borne 100% by Plaintiff. In the cost shifting section of her Addendum (at p. 11),

Plaintiff cites the seven factors used in *Zubulake* prior to the amendment to the federal rules. Many of these *Zubulake* factors are very similar to the factors now laid out in the Advisory Notes to Rule 26.[7] Even if the Court were to use these factors to consider cost-shifting for search of the inaccessible data, rather than the factors in the current Advisory Note, the result would be the same. The first, second, fourth and sixth factors are the same as factors discussed above – (1) the discovery request is not and cannot be sufficiently specifically tailored for restoration of the necessary backup tapes, (2) information is available from other sources such as the complaint hotline database, (4) the costs of production are enormous, and (6) the importance of the issue is questionable in light of the fact that all complaints discovered thus far were remedied at the time and the managers appropriately disciplined. On the last point, Plaintiff appears to be merely continuing to fish for some rationale to support the collective action claims that were contained in the pre-fabricated complaint that she received from her counsel and that should have been obtained **prior** to filing her collective action suit.[8] Otherwise, as to the total cost of production compared to the amount in controversy, Amy Burkhart-Deal is the only Plaintiff in this action,

---

[7] The factors are: (1) The extent to which the request is specifically tailored to discover relevant information; (2) The availability of such information from other sources; (3) The total cost of production, compared to the amount in controversy; (4) The total cost of production, compared to the resources available to each party; (5) The relative ability of each party to control costs and its incentive to do so; (6) The importance of the issues at stake in the litigation; and (7) The relative benefits to the parties of obtaining the information. *Zubulake*, 217 F.R.D at 322.

[8] This case is different from the situation in *Zubulake*, where the plaintiff did show some good cause to search the backup tapes because: 1) there the defendant entered into an agreement with plaintiff to provide e-mails of select individuals "if retrieval is possible"; 2) the plaintiff asked for the e-mails of only five individuals, and in response received only 100 pages of e-mails from those individuals that were "unquestionably relevant"; 3) **Zubulake knew there were other relevant e-mails from these custodians that had not been produced because she herself produced approximately 450 pages of e-mail correspondence,** including a smoking gun e-mail that said Zubulake should be fired "ASAP" after her EEOC charge was filed; and 4) the amount at issue in backpay and frontpay was $13,000,0000, exclusive of attorneys fees and costs. *Zubulake*, 217 F.R.D. at 312 n.8, n.9, 313, 317. There are no similar facts in this case suggesting good cause to consider doing the search with cost-shifting.

no other person has opted in to the action, and the value of her claim of unpaid compensation would be well under $10,000, even with the liberal assumption that Plaintiff worked off-the-clock for ten hours a week. By comparison, CitiFinancial would be forced to incur between $450,000 and $800,000 in discovery costs just to convert the data into a readable format, and then potentially millions of dollars on top of that to conduct the search and review if Plaintiff's Search Plan regarding the pre-2007 legacy e-mail system were adopted by the Court without any cost-shifting. As to the relative ability of each party to control costs and incentive to do so, CitiFinancial has no ability to control the cost of the restoration of backup tapes that Plaintiff has requested, and Plaintiff has no incentive to reign in her request. Finally, as to the relative benefit to each party of obtaining the information, the request seems unlikely to result in any relevant information at all because, as previously discussed, none of the documents relating to complaints produced to date provide evidence to support Plaintiff's theory that there was a policy or practice of refusing to pay overtime by CitiFinancial. Therefore, if the discovery is allowed, all of these factors weigh in favor of shifting the costs onto Plaintiff. *See Byers v. Illinois State Police*, No. 99-C-8105, 2002 WL 1264004, at *11-*13 (N.D. Ill. June 3, 2002) (where the defendants had switched to a new e-mail platform which could not read the old e-mails stored on backup tapes and the costs to be able to read the old e-mail, including licensing, would be between $20,000 and $30,000, the plaintiffs would import a "significant" financial burden on the defendants, and plaintiffs were only entitled to the archived e-mails if they were willing to pay for the entire cost of licensing the old e-mail program, so that the e-mails could be searched); *Rowe Entertainment Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 429-33 (S.D.N.Y. 2002) (reviewing factors and concluding that requesting plaintiff should bear entire costs of production, aside from the cost of the privilege review); *Wiginton v. CB Richard Ellis Inc.*, 229 F.R.D. 568, 573-577 (N.D.

Ill. 2004) (requiring defendant to bear 25% of cost and plaintiffs to bear 75% of costs of restoring defendant's backup tapes, searching them and transferring them to an electronic viewer).

        2.      <u>Electronic Search of the Corporate E-mail Archive of the Current E-mail System.</u>

      Although not addressed at all in Plaintiff's Addendum, Plaintiff's search plan also requires CitiFinancial to electronically search the archive of e-mails in the current system for over 1,300 custodians over a four year period. Contrary to Plaintiff's charge that CitiFinancial did not search e-mails at all, CitiFinancial has already had all managers responsible for the 145 branches and all HR Generalists and Directors manually search all the e-mails that they maintained in their Microsoft Outlook files on their computer. (Judge Dep. at 34-35.) To require an electronic search of the e-mail archives for hundreds of managers and HR personnel, as well as 900-1,000 branch employees, would be unduly burdensome because CitiFinancial's current e-mail archive system, although searchable, cannot handle the multitude of search terms proposed by Plaintiff, particularly as applied to the volume of data requested. (Makin Decl. at ¶ 3.) With a list of 100 search terms for a hundred custodians, the linear process in the program could potentially take six months or more to produce results, and even single custodian could take many months. (Makin Decl. at ¶ 3.) Thus, in order to conduct the Boolean searches requested in Plaintiff's Search Plan, CitiFinancial will have to export all the e-mail data from the e-mail archives to a vendor to be uploaded into a searchable platform, searched and then prepared for review.

      In connection with this discovery dispute, CitiFinancial has attempted to determine the costs of the conversion to a searchable platform and a search of e-mails in that platform by using sample volumes of e-mails for each of the categories of employees affected. CitiFinancial

23

selected a sample of 21 individuals employed in the relevant areas (including branch employees, branch managers, EVPs, regional managers/area directors, and HR personnel) during the relevant period. The total volume of e-mails for the 21 employees was 75 GB. Using weighted averages to account for the approximate number of employees in each position whose e-mails would have to be searched under Plaintiff's proposed Search Plan, CitiFinancial estimates that the total size of the e-mail files for the over 1,300 custodians would be 1,042.73 GB. (Makin Decl. at ¶ 4.) CitiFinancial solicited three vendor estimates and determined that it would cost approximately between $312,819 - $512,365 just to load this data into a platform that supports Boolean searches of the type demanded by Plaintiff. (Makin Decl. at ¶ 5.) It would cost an additional estimated amount of approximately between $375,600 -$532,100, to load the remaining data into a reviewable platform, for a total of $768,319 to $1,124,365. (Makin Decl. at ¶ 7-8.) The cost of the subsequent legal and privilege review of this data is likely to cost at least three times that amount. (Makin Decl. at ¶ 9.) Accordingly, the sheer volume of data in the current e-mail archive requested by Plaintiff to be searched renders the search proposed unduly burdensome, excessively costly, and therefore inaccessible under Rule 26 and the case law and factors used therein cited above.

Notwithstanding the excessive costs of Boolean searches of the current e-mail archive, and if the Court determines that Plaintiff has established good cause to search the current e-mail archive (which Plaintiff has not), CitiFinancial is willing to conduct a more reasonable and limited electronic search of the archived e-mails, limited to a search of 20 GB of data, which constitutes approximately two million pages of documents, with the selection of how to apportion that data among custodians or time periods to be determined by the Court or Plaintiff and with the costs to be equally split between the parties.

CitiFinancial's alternative proposal is consistent with, and even more generous, than what the court ordered in the *Petcou* case. There, the court, after denying search of the backup tapes in their entirety, held that plaintiffs were only permitted to search undeleted e-mails in the active system for current employees specifically named in the complaint as having sexually explicit e-mails, and any e-mails with sexual content sent by Plaintiff's former co-workers of which defendant was currently aware and had retained. *Petcou*, 2008 WL 542684, at *2. Accordingly, here where none of the individuals to be searched is important enough to be named in the complaint, Plaintiff has not demonstrated that the search requested is likely to turn up any additional relevant evidence, and Plaintiff is asking for the search of an archive rather than e-mails in the active Microsoft Outlook system, limiting the search to 20 GB of data with the cost to be split between the parties is appropriate.[9]

Moreover, consistent with Plaintiff's invitation to use best efforts to modify the search so that it is more likely to pull documents relevant to the search terms, CitiFinancial initially proposes a modified list of search phrases (which is attached as Exhibit E). As compared to Plaintiff's list of over 100 words and phrases, this modified list of 44 words and phrases eliminates common words and phrases that are unlikely to relate in any way to a complaint about compensation or failure to receive overtime. To give just a few examples, words by themselves like "break," "timeclock," and "retaliat*" would be unlikely to pull responsive documents regarding a complaint about failure to receive overtime pay. Similarly, many of the phrases proposed by Plaintiff, such as "miss w/5 pay*" fail to recognize that one of the main duties of

---

[9]    *See also Multitechnologies Services, L.P. v. Verizon Southwest*, No. 02-702, 2004 WL 1553480, at *1-*2 (N.D. Tex. July 12, 2004) (where the requested search in computer databases to obtain names of Verizon's past and present customers was estimated to cost approximately $60,000, holding that this was an undue burden and shifting half the costs to the requesting party was appropriate).

DB1/62681879

branch employees is to collect delinquent loan payments from borrowers, and the search terms proposed would likely pull enumerable documents relating to whether customers "missed payments" on their loans.

However, this initial proposal should be understood as tentative and subject to modification after all the e-mails at issue are uploaded by the vendor and a sampling of the volume of data that hits using each of these terms can be more accurately determined. The Sedona Conference, which is a non-profit organization dedicated to developing the "best practices and guidelines in specific areas of the law that may have a dearth of guidance" and has a working group on electronic document retention and production that make it a recognized leader in the field of e-discovery, states that:

> The initial selection and refinement of search terms can also benefit from the application of sampling techniques that can help the review team to rank the precision and recall of various terms and concepts. Reviewing samples of information that include selected search terms or concepts and ranking their relative value based on their efficiency in retrieving relevant information (recall) and their efficiency in excluding non-relevant information (precision) can help the review team to focus the selection of terms.

*The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age*, at 215 (Fall 2007) (available at http://www.thesedona conference.org/publications_html); *see also The Sedona Principles*, Principle Eleven (2007) ("[a] responding party may satisfy its good faith obligation to preserve and produce relevant electronic data by using electronic tools and processes, such as data sampling . . . ."). If the Court orders a search to be done, CitiFinancial should be allowed to propose additional modifications to the term list after such sampling.

Finally, if this Court orders a search of the current system e-mail archive, under Federal Rule of Evidence 502(b)(2), CitiFinancial must take "reasonable steps to prevent disclosure [of

privileged information]" which should including reviewing all hits for privilege, and Plaintiff concedes that such review should occur in her Search Plan.  Accordingly, CitiFinancial also is entitled to conduct a simultaneous relevance review.  Plaintiff does not cite a single case to support her argument that CitiFinancial <u>must</u> produce all documents that contain any of the search terms.  In fact, a relevance review would be critical because those individuals working in HR and the higher level managers were responsible for many other branches beyond the 145 at issue.  Although Plaintiff claims that "far too many documents were culled from Defendant's production without justification," she offers no basis for this belief.[10]  Thus, if the Court orders CitiFinancial to conduct another search of the current e-mail system, CitiFinancial is entitled to produce only those non-privileged documents that are actually responsive to Document Request No. 15, and Plaintiff's concept of "presumptive responsiveness" should be rejected as inconsistent with the applicable rules of civil procedure.

**B.    Plaintiff's Request That CitiFinancial Re-Search All Hard Copy Documents By Checking Every Document In Existence Against A List of Over 100 Search Phrases Is Unnecessary, Unduly Burdensome and Duplicative.**

Plaintiff attempts to argue that CitiFinancial should be forced to search again in all of its hard copy documents by misrepresenting testimony on the nature of the search already conducted.  Plaintiff claims that no effort was made to describe "relevant" documents.  (*See* Addendum at 13, citing Judge Dep. at 44.)  In fact, although CitiFinancial's internal legal counsel who instructed managers to conduct searches may not have used or defined the term "relevant" during the conference call with managers, he instructed them to provide all documents relating to complaints about compensation or overtime.  (Judge Dep. at 38-39.)  The instruction

---

[10]    In fact, Kit Yong gave examples of the reason why certain documents were withheld as not relevant when electronically searching the hotline database -- the word "over" designed to find "overtime" "over time" or "over-time" resulted in a hit on a complaint by an employee who had a conflict with another employee who jumped <u>over</u> a table, and the word "pay" picked up complaints that employees did not receive pay increases.  (Yong Dep. at 72.)

to searchers made clear that the search should not be limited or restricted and that documents that might fall under the instruction could take many forms. (Judge Dep. at 41-43.) To remedy the alleged deficiency, Plaintiff would have each of these over 200 CitiFinancial employees involved in the search review documents robotically for words, not read them intelligently for context. Rather than reading a document once to determine whether it relates to a complaint about compensation or failure to pay overtime – as has already been done – each person would have to go back through each document dozens of times, each time looking for a different word or phrase. This exercise would undoubtedly be extremely burdensome as comparing just a single document to a list of over 100 search phrases could take several hours per document. Plaintiff's approach is nonsensical and extremely burdensome, and therefore should be rejected.

Plaintiff also claims that the search was not adequate because no written instructions were provided, but as discussed *supra*, a thorough explanation of the topic of the search was given to all searchers, and there is no reason why instructions must be written rather than verbal. Plaintiff's demand that all parties must keep written record of every step they take is completely unnecessary, and Plaintiff's requirement that searchers must now certify that they performed a search was already done in the last search. (Judge Dep. at 40-41.) Plaintiff's suggestion that there was something improper because CitiFinancial explained to all searchers that they were looking for documents to produce in discovery in class action litigation, but did not use the words "pursuant to court order" is equally strange and misguided. Plaintiff offers no justification in her Addendum for this requirement. Finally, unlike the search for hotline data which Plaintiff claims must be supervised by an attorney, she claims that the search of hard copy documents must be re-conducted so that it can be supervised by a non-attorney. There is absolutely no legal or rational basis for these demands, or the unnecessary and onerous requirement that a list of

over 100 search phrases be read and compared against every hard copy document, and as such, CitiFinancial requests that this Court deny Plaintiff's motion to compel CitiFinancial to re-conduct the search of all its hard copy documents.

**C.    Plaintiffs' Request To Re-Search Hotline Complaint Database Using Boolean Search Terms Is Not Technically Possible And Also Unnecessary.**

Finally, in her Addendum, Plaintiff requests that the search of the hotline database be conducted again using the list of over 100 Boolean search terms she proposes.  This request is strange since by using the key underlying words, without the modifiers that Plaintiff proposes, CitiFinancial's search was broader than that requested by Plaintiff.  Plaintiff also attempts to mislead the Court and make it seem that the key words used were inadequate, for example, by stating that the word "overtime" was not used and that wildcards and root expanders were not used.  (Addendum at 12.)  In fact, the FileMaker Pro database treats all words entered as though they have wildcards on either side.  Ms. Yong testified that her search for the word "over" would pull up "overtime," "over time," "turnover," etc.  (Yong Dep. at 72.)  Accordingly, the search terms CitiFinancial used to search the hotline database was thorough and appropriate.  In any event, Plaintiff's requested list of search terms is not even possible because the FileMaker Pro database that contains the relevant hotline complaint data <u>does not allow</u> for Boolean searches. (Declaration of Kit Yong, March 27, 2009, at ¶ 4, which is attached hereto as Exhibit F.)

Although CitiFinancial does not believe any additional search of the FileMaker Pro hotline database is necessary, it is willing to consider an additional search that is not unduly burdensome.  Plaintiff specifically complains that CitiFinancial did not search "off-the-clock" or "hours," and if the Court so orders, CitiFinancial will run another search of the hotline database using the terms "hours" and "off-the-clock," and will agree to Plaintiff's request that an attorney

or paralegal review the results for relevance rather than Ms. Yong.  CitiFinancial requests that

this Court deny any other requests for additional searches with respect to the hotline database.[11]

## IV.    CONCLUSION

As demonstrated above, CitiFinancial's pre-August 2007 legacy e-mail system is

inaccessible and Plaintiff has not shown good cause for its search; the requested searches of the

current e-mail archive are unduly burdensome and expensive; the ethics hotline database cannot

handle Boolean search terms and has already been thoroughly searched; and the request that

CitiFinancial search again through all hard copy documents against a list of over 100 search

phrases is burdensome and unnecessary.  CitiFinancial requests that, other than permitting the

search of the FileMaker Pro hotline database for two additional search terms requested by

Plaintiff, this Court deny Plaintiff the excessive discovery that she seeks.  Plaintiff's fishing

expedition should come to an end.  Alternatively, if any additional e-mail search is required, the

Court should only require CitiFinancial to do a sampling involving 20 GB of data from the

current e-mail archive, with costs to be borne equally by both parties.

---

[11]     Although not addressed in the Addendum itself, Plaintiff also requests a series of
unnecessary duplicative searches involving hotline complaints in her Search Plan, including
searching the Ethics Office level above Kit Yong and subpoenaing the files of the third-party
vendor.  Those additional searches are unnecessarily cumulative.  All data entered by the vendor
travels through a secure one way link and automatically populates certain portions of the Ethics
Office database.  This Ethics Office database contains records of all complaints received on any
topic by any Citigroup subsidiary.  All complaints relating to CitiFinancial and to HR issues –
which includes compensation – are placed in a subset of the larger database maintained by Ms.
Yong.  Plaintiff has offered no reason why it is necessary to search the third-party vendor's files,
the larger database, or the files of other individuals in the Ethics Office.  Plaintiff also makes the
vague demand that CitiFinancial search all the "co-workers, supervisors and subordinates of Kit
Yong and Catherine Miller" which again is not only duplicative and unnecessary, but it is not
even clear who or how many individuals this intended to cover.  Ms. Yong and Ms. Miller are
the only two people who perform the hotline functions described herein.  Since there is no basis
to fish for other sources of hotline complaints when the comprehensive source of such
complaints was diligently searched, and since Plaintiff does not even attempt to justify her
request in her Addendum, that part of Plaintiff's Search Plan should also be rejected.

Respectfully submitted,

/s/ Christopher K. Ramsey
Christopher K. Ramsey  (PA ID # 63293)
Stephanie R. Reiss (PA ID # 88316)
MORGAN, LEWIS & BOCKIUS LLP
32nd Floor, One Oxford Centre
Pittsburgh, PA 15219
412.560.3300
412.560.7001 (fax)
cramsey@morganlewis.com
sreiss@morganlewis.com

Sam S. Shaulson *(pro hac vice)*
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY  10178
212.309.6000
212.309.6001 (fax)
sshaulson@morganlewis.com

Attorneys for Defendant CitiFinancial, Inc.

DB1/62681879